07-0031-cr
USA v. Juan Vincent Gomez Castrillon (USA)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2007

(Argued: May 13, 2008          Decided: October 14, 2008)

Docket No. 07-0031-cr

--------------------------------------------------------x

UNITED STATES OF AMERICA,

      Appellant,

                -- v. --

JUAN MANUEL HUEZO,

      Defendant-Appellee.

--------------------------------------------------------x

B e f o r e :  NEWMAN, WALKER, and SOTOMAYOR, Circuit Judges.

Appeal by the government from an order granting defendant's motion for acquittal notwithstanding the guilty verdict, entered in the United States District Court for the Southern District of New York (Samuel Conti, Judge). We hold that the district court erred in concluding that, on the basis of the evidence presented, no rational juror could have found that defendant had the requisite knowledge and intent to support his convictions for money laundering and conspiracy to commit money laundering.

REVERSED AND REMANDED.

Judge NEWMAN concurs in a separate opinion.

Judge SOTOMAYOR dissents in a separate opinion.

                               DANIEL L. STEIN, Assistant

United States Attorney, of counsel (Jeffrey A. Brown, Diane Gujarati, Assistant United States Attorneys, of counsel, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, N.Y., for Appellant.

JULIA L. GATTO, Sercarz & Riopelle, LLP, New York, N.Y., for Defendant-Appellee.

JOHN M. WALKER, JR., Circuit Judge:

Following a jury trial, defendant-appellant Juan Manuel Huezo was found guilty of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(1) and 2, and conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). The District Court for the Southern District of New York (Samuel Conti, Judge[1]) granted Huezo's post-verdict motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c)(2), concluding that the evidence was insufficient to support the knowledge and specific intent elements of both offenses.

On appeal, the government challenges the district court's ruling, arguing that there was sufficient circumstantial evidence for a rational juror to find that Huezo knowingly participated in a money laundering conspiracy and acted with the intent to commit the underlying substantive offense. Because we agree with the

---

[1] The Honorable Samuel Conti, United States District Judge for the Northern District of California, sitting by designation in the Southern District of New York.

government, we reverse the judgment of acquittal and remand for further proceedings consistent with this opinion.

**BACKGROUND**

On June 14, 2005, Huezo was charged with conspiring to launder the proceeds of narcotics transactions and with committing, and aiding and abetting the commission of, the substantive offense of money laundering. At trial, which began on October 4, 2006, the government presented evidence of Huezo's participation in an international money laundering conspiracy whereby millions of dollars in narcotics proceeds were secretly remitted to drug suppliers in Colombia from 2002 to 2005.

On November 5, 2004, co-conspirators Jose Linares and Eric Echevarria drove a Jeep Cherokee registered to Huezo and bearing Connecticut license plates to a meeting in Manhattan with an undercover officer named Robert Del Rio. At the meeting, at which Huezo was not present, Linares and Echevarria discussed the plans for delivering $1 million in two $500,000 installments to Del Rio, who was posing as a money launderer.

On November 8, 2004, the date of the first delivery, Huezo drove Linares to meet Del Rio in Manhattan. When they arrived, Del Rio walked to the back of Huezo's Jeep and removed a black bag from the trunk, presumably opened by Huezo from the driver's seat. The bag contained $500,000, "bundled up in stacks," as is typical for money laundering transactions. After the delivery,

-3-

surveillance officers followed the Jeep to a house in Stamford, Connecticut, where Huezo and Linares picked up Echevarria and headed downtown for some shopping and dining. The three men then returned to the Connecticut house, where surveillance was discontinued.

On November 10, 2004, at 8:00 AM, the officers resumed surveillance of the Connecticut house. At some point that day, DEA Agent Adamo observed Huezo leave the house holding a small black bag that was "like a camera bag," and place it behind the driver's seat of the Jeep. Huezo got into the Jeep and started the engine. With the engine running, Huezo left the Jeep and positioned himself so that he could see the front of the house. Echevarria then walked out of the house, walked to the Jeep, and placed a black suitcase in the back of the Jeep as Huezo got back behind the wheel. Adamo testified that: "Based on my experience, [Huezo] was basically helping to guard the movement of that bag from the residence to the Jeep." Shortly thereafter, Linares emerged from the house and got into the Jeep, and the three men drove off to make the second delivery.

En route, New York state police stopped the Jeep for speeding. Once the vehicle was pulled over, Senior Investigator Hector Fernandez discovered that although Huezo's paper registration indicated that the Jeep was registered in Huezo's name and to a Stamford address, that registration was not on file

with the state's computer system.  Investigator Fernandez testified that one possible explanation was that "[i]f it's a newly registered vehicle, it takes a while before the vehicle is into the system."

The officers decided to take the Jeep back to the state police barracks to verify its registration.  At the barracks, an inventory search of the vehicle revealed that the suitcase in the trunk contained "[b]locks of money," totaling $500,000, and the small camera bag contained $6000, similarly packaged.  Officers also found a hotel receipt in Huezo's name for a three-day stay in Connecticut from October 28 to October 30, 2004.  The receipt listed a California address for Huezo.  Linares and Echevarria had presented California driver's licenses at the time of the stop.

At the close of the government's case, and again at the close of all of the evidence, Huezo moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  He argued, inter alia, that the government had not presented sufficient evidence to establish his knowledge of, or intent to further, the money laundering conspiracy.  The district court reserved decision on the motion.

On October 11, 2006, the jury returned a guilty verdict on both counts, and Huezo renewed his motion for acquittal.  On November 6, 2006, the district court granted Huezo's motion,

finding that "no rational jury could have found on the basis of the evidence presented that the government proved beyond a reasonable doubt Defendant had the necessary knowledge and intent to be convicted of the crime of money laundering or the crime of conspiracy to commit money laundering, as charged." In particular, the district court found:

> The evidence fails to prove: that the Defendant knew the object of the conspiracy was to launder the proceeds of some sort of criminal activity; that he joined the conspiracy with such knowledge and with the specific intent to further that objective; or that he took the actions he did with such knowledge and intent.

The district court first marshaled the evidence against Huezo: that Huezo's Jeep was used to drive to the November 5, 2004 meeting with Del Rio; that Huezo drove his vehicle and transported the money to the November 8 and November 10 drop-offs; that he personally handled the small black bag containing $6000; that he socialized with Linares and Echevarria following the November 8 drop-off; and that he was "watching and guarding" the movement of the larger suitcase from the house to the Jeep on November 10. The district court then noted the lack of direct evidence that Huezo knew the specific purpose of the trips, that he was privy to conversations regarding the details of the money laundering transactions, or that he ever saw the contents of the two suitcases, which would not have appeared to the casual observer to contain money to be laundered. Furthermore, the district court noted, the government had not connected the $6000

that Huezo placed behind the driver's seat to any money laundering transaction.

Thus, the district court reasoned, although the evidence was sufficient for a jury to find that Huezo was "<u>probably</u> guilty of <u>some</u> crime," it was insufficient for a jury to find beyond a reasonable doubt that Huezo knowingly engaged in a money laundering conspiracy with the specific intent to commit money laundering or engaged in the substantive offense of money laundering.

The government now appeals the judgment of acquittal, and we reverse.

**DISCUSSION**

**I.   Standard of Review**

We review de novo the district court's conclusion that the evidence was insufficient to support Huezo's conviction. <u>United States v. Autuori</u>, 212 F.3d 105, 114 (2d Cir. 2000). "In so doing, we view the evidence presented in the light most favorable to the government, and we draw all reasonable inferences in its favor. Furthermore, we consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." <u>Id.</u> (citation omitted). We must uphold the jury's verdict if "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).

## II. Requirement of Knowledge and Specific Intent

### A. Money Laundering

The substantive offense of "transaction money laundering" requires proof of both knowledge and specific intent. Section 1956(a)(1)(B)(i) of Title 18 imposes punishment on anyone who,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity[,] knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(i). We have interpreted the latter element, "knowing that the transaction is designed in whole or in part to conceal or disguise," as requiring "proof of intent to conceal." See United States v. Stephenson, 183 F.3d 110, 121 (2d Cir. 1999).

The Supreme Court's recent decision in Cuellar v. United States, 128 S. Ct. 1994 (2008), supports this interpretation. In Cuellar, the defendant was convicted under the "transportation money laundering" statute, 18 U.S.C. § 1956(a)(2)(B)(i), of attempting to transport the proceeds of unlawful activity across the United States border, "knowing that such transportation . . . [was] designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the [funds]." 18 U.S.C. § 1956(a)(2)(B)(i). Interpreting this knowledge element, the Court stated that "[t]he statutory

text makes clear . . . that a conviction under this provision requires proof that the <u>purpose</u> – not merely effect – of the transportation was to conceal or disguise a listed attribute." <u>Cuellar</u>, 128 S. Ct. at 2005 (emphasis added); <u>see also</u> <u>id.</u> (suggesting that the government must show, "for instance, . . . that petitioner knew about or intended the effect"). The Court specified that

> merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money. Our conclusion turns on the text of § 1956(a)(2)(B)(i), and particularly on the term "design." In this context, "design" means purpose or plan; <u>i.e.,</u> the intended aim of the transportation.

<u>Id.</u> at 2003.

Although the transaction and transportation provisions of the money laundering statute are distinct, they are almost identically worded. "The use of similar language, let alone identical language, in two different provisions of the same statute is, as the Supreme Court has emphasized, a strong indication that the two provisions should be interpreted <u>pari passu</u>, <u>i.e.,</u> in the same manner." <u>Sompo Japan Ins. Co. of Am. v. Union Pac. R.R.</u>, 456 F.3d 54, 66 (2d Cir. 2006) (alteration, internal quotation marks, and citation omitted). Thus, <u>Cuellar</u> confirms that a conviction for transaction money laundering, like a conviction for transportation money laundering, requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds.

**B.  Aiding and Abetting**

Huezo was also charged with money laundering on an aiding and abetting theory.  Under 18 U.S.C. § 2(a), anyone who aids or abets the commission of an offense against the United States is punishable as a principal.  To convict a defendant of aiding and abetting a given crime, the government must prove "that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime."  United States v. Reifler, 446 F.3d 65, 96 (2d Cir. 2006) (internal quotation marks and citation omitted).  To prove that the defendant acted with specific intent, the government need not establish that he knew all of the details of the crime, only that he "joined the venture, [that he] shared in it, and that his efforts contributed towards its success."  Id. (alteration in original) (internal quotation marks and citation omitted).

**C.  Conspiracy**

In addition to the substantive offense of money laundering, Huezo was charged with conspiring to launder money, in violation of 18 U.S.C. § 1956(h).  "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of

-10-

the conspiracy; and that an overt act in furtherance of the conspiracy was committed." United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999) (internal quotation marks and citation omitted). Proof that the defendant simply associated with conspirators is insufficient, United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (per curiam); nevertheless, "[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence," United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007).

The government need not show that the defendant knew all of the details of the conspiracy, "so long as he knew its general nature and extent." United States v. Rosa, 17 F.3d 1531, 1543 (2d Cir. 1994). Nor must the government prove that the defendant knew the identities of all of the other conspirators. United States v. Downing, 297 F.3d 52, 57 (2d Cir. 2002). Indeed, a defendant may be a co-conspirator if he knows only one other member of the conspiracy, see United States v. Manarite, 448 F.2d 583, 589 (2d Cir. 1971), and "a single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy," United States v. Tramunti, 513 F.2d 1087, 1112 (2d Cir. 1975). As with every criminal offense, the government bears the burden of

proving each element beyond a reasonable doubt.[2]

## III. Sufficiency of the Evidence

---

[2] The government urges that "once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." Br. for Appellee at 29 (quoting United States v. Samaria, 239 F.3d 228, 234 (2d Cir. 2001) (internal quotation marks and citation omitted)). To be sure, this language, and similar language that once a conspiracy has been established, "only slight evidence" is required to link another defendant with it, has been a part of our case law for many years. See United States v. Marrapese, 486 F.2d 918, 921 (2d Cir. 1973). Neither of these formulations was part of the jury charge in this case and, for the reasons set forth in Judge Newman's thoughtful concurrence, with which we are in agreement, the panel does not think that this formulation should remain a part of our case law.

The "not overwhelming evidence" or "slight evidence" formulation risks misleading not only jurors but district and appellate courts reviewing post-verdict challenges as to the sufficiency of the evidence. The "slight evidence" formulation may lead juries and reviewing courts improperly to focus on simply the quantity of evidence of a defendant's participation in a conspiracy rather than the quality of that evidence (whether quantitatively extensive or limited) viewed in the context of the particular conspiracy at issue. The relevant inquiry – and the determinative inquiry – is not whether a particular quantum of evidence has been presented but whether the evidence that has been adduced establishes, in the mind of a reasonable juror, the defendant's guilt beyond a reasonable doubt. Cf. United States v. Murray, 618 F.2d 892, 903 (2d Cir. 1980) ("A single act may be sufficient for an inference that an individual is involved in a conspiracy; the qualitative nature of the act viewed in the context of the entire conspiracy determines whether that inference can be drawn in a particular case." (emphasis added) (internal quotation marks and citations omitted)).

We now hold that the 'not overwhelming evidence' and 'slight evidence' formulations do not accurately describe the government's burden of proof in conspiracy cases, and the use of these formulations should be discontinued. We note that prior to filing, this opinion has been circulated to all members of this court. See, e.g., United States v. Regalado, 518 F.3d 143, 146 n.2 (2d Cir. 2008) (per curiam).

-12-

The government argues that the circumstantial evidence it presented was sufficient for a rational juror to infer that Huezo had the requisite criminal knowledge and intent to support his convictions for money laundering and conspiracy to commit money laundering. We agree.

As an initial matter, there was abundant evidence establishing the existence of a large-scale conspiracy to launder money and its connection to the November 8 and November 10 transactions. There was expert testimony as to the laundering of narcotics proceeds in dollars by using money laundering brokers who would deposit the cash in small increments, sell the dollars to businessmen for pesos at a below-market rate, and then deliver the pesos in cash to dealers in Colombia. Cooperating witness Edgar DeCastro, a major Colombian money broker, testified to laundering over $50 million, nearly all of which were the proceeds of drug deals. He described in detail, generally consistent with the expert testimony, the techniques and individual steps involved in his money laundering schemes, and he specifically discussed the arrangements he made in November 2004 to launder $1 million that would be delivered to New York City in two installments of $500,000.

Trial testimony from a member of the Drug Enforcement Task Force and surveillance team established DeCastro's role in orchestrating the November 5 meeting of Linares, Echevarria, and

undercover agent Del Rio, at which the three men scheduled the first $500,000 drop-off for November 8. And Del Rio testified that just prior to that delivery, he and Linares scheduled the second $500,000 drop-off for November 10. Furthermore, the money being delivered was packaged in bundled stacks or "bricks," and a government witness testified that such packaging was typical for money laundering transactions involving the proceeds of narcotics sales. From all of this evidence, a rational juror could easily have concluded that the money involved in the November 8 and November 10 transactions constituted the proceeds of criminal activity (namely, drug trafficking) and that the transactions were "designed to conceal or disguise" the nature, location, source, ownership, or control of those proceeds. 18 U.S.C. § 1956(a)(1)(B)(i).

There was sufficient circumstantial evidence to connect Huezo to this money laundering conspiracy and to support an inference that Huezo knew about the conspiracy and acted with the specific intent to participate in it for the purpose of concealing or disguising one of the statutorily specified attributes of the funds. Although "a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy," United States v. Samaria, 239 F.3d 228, 235 (2d Cir. 2001), and "is insufficient to prove aiding and abetting" even if the

-14-

defendant has knowledge of the crime, United States v. Cruz, 363 F.3d 187, 198 (2d Cir. 2004) (internal quotation marks and citation omitted), the evidence in this case of Huezo's activities went well beyond mere presence or association.

The government presented evidence from which the jury could find that Linares and Echevarria drove to the November 5 meeting with Del Rio in Huezo's Jeep, which was loaned to them for that purpose (inferrable from the next day's trip); that on November 8, Huezo, accompanied by Linares, drove a suitcase containing $500,000 to a meeting with Del Rio and unlocked the trunk from the driver's seat to allow Del Rio to remove the suitcase; that on November 10, after "basically helping to guard" the movement of a second suitcase containing $500,000 into the Jeep, Huezo drove with Linares and Echevarria to a second, planned drop-off meeting; and that, at least during this time period, he shared a residence and socialized with Linares and Echevarria. Moreover, there was evidence that Huezo personally took possession of the small bag containing $6000, that he placed it behind his own seat in the Jeep, and that the money was packaged similarly to the $500,000 in the larger suitcases. Although there was no direct evidence that Huezo saw or knew what was in any of the bags, a rational trier of fact could infer from this circumstantial evidence and from Huezo's special treatment of the small bag (in placing it behind the driver's seat in the vehicle registered to

him) that the bag belonged to Huezo, that it constituted payment of $6000 for his assistance, and, from its packaging, that the money came from the same funds that were the subject of the money laundering operation.  From this conclusion, and from the evidence that Huezo resided in the same house as Linares and Echevarria – the same house where all of the money was kept – a jury could reasonably infer that Huezo had the requisite knowledge and specific intent to commit the money laundering crimes charged.  See Samaria, 239 F.3d at 235 (noting that "[c]ircumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime," and that such indicia may include evidence that the defendant "received a share of the profits from the conspiracy").

Furthermore, jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.  Cf. Salameh, 152 F.3d at 143; United States v. Gleason, 616 F.2d 2, 13 n.7 (2d Cir. 1979).  Based on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds, to be present when Del Rio removed the first suitcase containing $500,000 from the trunk, and to share a house

-16-

over several days with witting conspirators.

The government also presented circumstantial evidence that shortly before the November 2004 money laundering transactions Huezo, Linares, and Echevarria had come to Connecticut from California for the specific purpose of carrying out those transactions. Although Huezo's vehicle had Connecticut license plates, the police discovered at the November 10 traffic stop that the Jeep's Connecticut registration did not appear in the state's computer system, which can occur when a vehicle has been recently registered. And when officers searched Huezo's Jeep, they found a receipt from a hotel in Connecticut at which Huezo had apparently stayed in late October 2004, just days before the November transactions. The receipt provided a California address for Huezo, and both Linares and Echevarria possessed California driver's licenses. Taken together, all of this evidence supports a reasonable inference that the three men traveled from California to Connecticut and met for the express purpose of facilitating the money laundering conspiracy. From this conclusion, a jury could reasonably infer that Huezo participated in the conspiracy by design and not simply by happenstance, and that his involvement was both knowing and intentional.

Viewing the evidence in its totality, as we must, we find that the government established more than just Huezo's association with money launderers and his presence at critical

-17-

events.  In that respect, this case differs from United States v. Samaria, upon which the district court relied in finding the evidence insufficient.  In Samaria, 239 F.3d at 231, the defendant raised a sufficiency challenge to his convictions for conspiracy to receive or possess stolen goods, conspiracy to commit credit card fraud, and the commission and aiding and abetting of credit card fraud.  The defendant argued that he was simply a "gypsy cab driver" who used his private vehicle to take passengers to their requested destinations, and that he therefore lacked the requisite criminal knowledge and intent.  Id. at 232.  At trial, the government's proof consisted of testimony that the defendant permitted conspirators to load a box containing stolen goods into his car, appeared to serve as a "lookout," and drove the conspirators to another location where they picked up and loaded additional boxes into a yellow cab.  See id. at 232-33, 236.  We held that this evidence only demonstrated the defendant's presence at the scene of a criminal act or his association with conspirators, and that it was insufficient to establish beyond a reasonable doubt that the defendant knew that the boxes he helped to transport contained stolen goods and that he acted with an intent to further the receipt or possession of stolen goods.  Id. at 236.

The instant case differs from Samaria in several respects.  In Samaria, the defendant's regular employment as a gypsy cab

driver supports an inference that he became involved in the conspiracy by happenstance and not by design – it so happened that the passengers who hired him were conspirators using his services to transport goods that they had stolen or purchased through credit card fraud. The same inference cannot be drawn about Huezo because he had no independent reason for his involvement as a driver in the conspiracy. Far from it, Huezo resided in the same house as the conspirators and was observed dining and shopping with them – activities that would suggest a relationship considerably closer than that of a mere driver-for-hire. Cf. id. at 233 ("At trial, the government presented no evidence of any other contact or connection between [the defendant] and [the conspirators] outside of [the defendant's] presence at the two pickups . . . .").

Together with the evidence suggesting that Huezo and his co-conspirators all came from California, and that Huezo had arrived in Connecticut just prior to the November 2004 transactions, the evidence taken as a whole amounts to more than the evidence of passive presence or association in Samaria. See United States v. Pedroza, 750 F.2d 187, 199 (2d Cir. 1984) ("[T]he evidence against Pedroza was not limited to proof that he was present at certain critical stages of the conspiracy in a way that could have resulted from happenstance . . . . Here, Pedroza had to criss-cross the country to be present at the critical times; and

there is nothing in the record to suggest that he may have had any purpose in these long trips and timely appearances other than to further the goals of the conspiracy.").

Furthermore, while there was no evidence that the defendant in Samaria personally handled any of the boxes containing stolen goods – only that he observed the conspirators load boxes into his car and into the yellow cab, see 239 F.3d at 232 – Huezo carried out of the Connecticut home that he shared with Linares and Echevarria a small bag containing $6000 in bundled cash and placed it behind the driver's seat of his Jeep. Huezo's actions are more consistent with those of a knowing participant whose role in the conspiracy was well planned than those of an unwitting outsider who was simply performing his regular job (as the defendant in Samaria appeared to be).

We therefore reject Huezo's argument that although a jury could reasonably find that he knew that some type of crime was being committed, it could not reasonably find that he specifically knew that the crime was money laundering or that he had the specific intent to commit, or aid and abet, that crime. The facts and circumstances presented at trial were sufficient for a jury to find beyond a reasonable doubt that Huezo knowingly and intentionally engaged in money laundering and in a conspiracy to launder money.

**CONCLUSION**

For the foregoing reasons, the district court's judgment of acquittal notwithstanding the jury verdict is REVERSED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.

<u>U.S.A. v. Huezo</u>

Docket No. 07-0031

JON O. NEWMAN, <u>Circuit Judge</u>, with whom Judge Walker and Judge Sotomayor (although dissenting on the merits) join, concurring:

Whether evidence suffices to permit a reasonable jury to find guilt beyond a reasonable doubt is sometimes a close question, as this case illustrates. The four judges who have conscientiously reviewed the record are evenly divided, but the hierarchical structure of the appellate process results in a 2-1 affirmance of the conviction. I agree with that result and join the entirety of Judge Walker's carefully reasoned opinion. I write separately, however, to take issue with one argument advanced by the Government. Although that argument accurately states a proposition that has often been repeated in the case law of this Court, I believe the proposition and a related formulation of it are incorrect, entered federal jurisprudence improvidently, have been routinely repeated without consideration of their infirmity, and should be discarded.

The Government contends that "'once a conspiracy is shown, the evidence sufficient to link another defendant to it need not

be overwhelming.'"[1] Br. for Appellant at 29 (quoting United States v. Samaria, 239 F.2d 228, 234 (2001).  A frequently used variation of the formulation states the proposition in these words:

> [O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it.

United States v. Marrapese, 486 F.2d 918, 921 (2d Cir. 1973).

I propose to discuss the origin of this proposition, its casual insinuation into federal jurisprudence, and its perniciousness, matters I deal with in reverse order.  Because the ill-advised formulation regarding the evidence needed to link a defendant to a conspiracy is more often expressed in federal case law as "slight evidence," rather than "not overwhelming evidence," I will refer to the "slight evidence" formulation.

The "slight evidence" formulation is inconsistent with the constitutional requirement that every element of an offense must

---

[1]     Our Court, which appears to be the only Circuit that uses the "not overwhelming" formulation, has used it many times since the first usage in United States v. Head, 546 F.2d 6, 9-10 (2d Cir. 1976).  See, e.g., United States v. Gaskin, 364 F.3d 438, 460 (2d Cir. 2004); States v. Reyes, 302 F.3d 48, 53 (2d Cir. 2002); United States v. Samaria, 239 F.3d 228, 234 (2d Cir. 2001); United United States v. DeSimone, 119 F.3d 217, 223 (2d Cir. 1997); United States v. Ciambrone, 787 F.2d 799, 806 (2d Cir. 1986).  Ciambrone, however,  importantly added, "It is necessary only that there be evidence of such substantiality as to justify a reasonably minded jury in believing beyond a reasonable doubt that the defendant was, in fact, connected with the conspiracy." Ciambrone, 787 F.2d at 806 (internal quotation marks omitted).

be proven beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 363 (1970). And it is undisputed that a defendant's participation in a conspiracy is an element of the conspiracy offense. See 1 Leonard B. Sand et al., Modern Federal Jury Instructions–Criminal ¶ 19.01, Instruction 19-3 (second element is "that the defendant knowingly and willfully became a member of the conspiracy").

Although evidence that is small in quantity might be highly probative, indeed, probative enough to persuade beyond a reasonable doubt, the "slight evidence" wording creates an unacceptable risk that juries, if the phrase is included in a charge, or appellate courts, if the phrase is used when reviewing sufficiency of evidence, will be misled (or mislead themselves) into thinking that the defendant's link to the conspiracy may be established by evidence insufficient to surmount the reasonable doubt standard. The vice of the "slight evidence" formulation, or our Court's more recent "not overwhelming" version, is that these formulations, when stated in juxtaposition with the test for establishment of the conspiracy itself, which is rendered without any hint of quantitative diminution, may too easily be taken as an implication that proving participation in a conspiracy is subject to a lesser standard of proof than proving

-24-

the existence of the conspiracy.  But that implication is simply wrong.

Judge Easterbrook has usefully outlined the several meanings that the "slight evidence" phrase might convey to those who hear or use it. See United States v. de Ortiz, 883 F.2d 515, 524 (7th Cir. 1989) (Easterbrook, J., concurring), reh'g granted and judgment vacated on other grounds, 987 F.2d 220 (7th Cir. 1990). After setting forth the likely meanings that would undermine the reasonable doubt standard, he acknowledged that the phrase "could mean that if someone joins the conspiracy, 'slight' activity to accomplish its objectives is enough, that peripheral conspirators commit the crime no less than the mastermind." Id.  But, as he wisely observed, "That we have to tease [this proper meaning] out of a formula with dubious alternative meanings, though, is a mark against its use." Id.  And in a particularly well-turned attack, he added:

> Maybe we could torture the phrase until it confessed to a constitutionally acceptable meaning, but why bother? Far better to throw it overboard and adopt a formula that clearly explains what we are about.

Id.  I fully agree, as I have previously argued, see Jon O. Newman, Beyond "Reasonable Doubt," 68 N.Y.U. L. Rev. 979, 994-95

(1993) (Madison Lecture).[2]

Retracing the steps by which the "slight evidence" formulation entered the case law of this Circuit not only identifies its dubious origin but also reveals how, in the course of repetition, important qualifications have been omitted. United States v. Ceballos, 340 F.3d 115 (2d Cir. 2003), recently used the "not overwhelming" formulation, quoting it verbatim from United States v. DeSena, 260 F.3d 150, 154 (2d Cir. 2001). See Ceballos, 340 F.3d at 124. DeSena quoted it verbatim from United States v. Head, 546 F.2d 6, 9-10 (2d Cir. 1976). See DeSena, 260 F.3d at 154. However, DeSena carefully went on to state, "Nevertheless, the prosecution must sufficiently prove the defendant's participation beyond a reasonable doubt," id. (citing United States v. Jones, 30 F.3d 276, 281-82 (2d Cir. 1994)), a critical qualification omitted in the later cases. Head, the first case in our Circuit to use the "not overwhelming" formulation, cited United States v. Marrapese, 486 F.2d 918, 921

---

[2] The title was not always understood. It was not just a shorthand version of the standard of proof in a criminal case. Rather, the title endeavored to capture the point of the Madison Lecture: "The time has come to move beyond the mere incantation of the 'reasonable doubt' standard in jury charges and to apply it faithfully as a rule of constitutional law in the course of appellate review of criminal convictions." Newman, supra, at 1002.

(2d Cir. 1973). See Head, 546 F.2d at 9-10.

Marrapese, however, did not use the phrase "not overwhelming," but used the similar formulation "only slight evidence is needed."[3] 486 F.2d at 921.  Marrapese cited United States v. Knight, 416 F.2d 1181, 1184 (9th Cir. 1969), and Bradford v. United States, 413 F.2d 467, 469 (5th Cir. 1969).[4] See Marrapese, 486 F.2d at 921.  Bradford said "only slight additional evidence," citing Poliafico v. United States, 237 F.2d 97, 104 (6th Cir. 1956). See Bradford, 413 F.2d at 469. Poliafico said "slight evidence may be sufficient," citing United States v. Cohen, 197 F.2d 26 (3d Cir. 1952). See Poliafico, 237 F.2d at 104.  Knight, the other case cited by Marrapese, said "slight evidence may be sufficient," citing Cohen. See Knight, 416 F.2d at 1184.  Thus, the trail back from Marrapese, whether through Knight or Bradford, leads to Cohen.

[3]	Since Marrapese, our Court has used the "slight evidence" phrase several times. See, e.g., United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); United States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998); United States v. Tejada, 956 F.2d 1256, 1265 (2d Cir. 1992); United States v. Vanwort, 887 F.2d 375, 386 (2d Cir. 1989).

[4]	Since Knight, the Ninth Circuit has rejected use of the "slight evidence" formulation, see United States v. Esparza, 876 F.2d 1390, 1391-92 (9th Cir. 1989), and since Bradford, the Fifth Circuit has also rejected it, see United State v. Partin, 552 F.2d 621, 628-29 (5th Cir. 1977), and United States v. Malatesta, 590 F.2d 1379, 1382 (5th Cir. 1979) (in banc). I discuss the views of all the circuits infra.

-27-

Cohen said "slight evidence may be sufficient," quoting this wording from Nye & Nissen v. United States, 168 F.2d 846, 852 (9th Cir. 1948), aff'd, 336 U.S. 613 (1949).[5] See Cohen, 197 F.2d at 29. Nye & Nissen said "slight evidence may be sufficient", citing Phelps v. United States, 160 F.2d 858 (8th Cir. 1947), and Meyers v. United States, 94 F.2d 433 (6th Cir. 1938). See Nye & Nissen, 168 F.2d at 852.

Phelps cited Galatas v. United States, 80 F.2d 15, 24 (8th Cir. 1935), and Marx v. United States, 86 F.2d 245, 250 (8th Cir. 1936)).[6] See Phelps, 160 F.2d at 868. Meyers, the other case cited by the Ninth Circuit in Nye & Nissen, also cited Marx and Galatas, but, following Galatas, used the "slight evidence" phrase in a way that pointed out the potential strength of the evidence, not its weakness: "[S]light evidence connecting a

---

[5] The citation to the Supreme Court's affirmance should have read "aff'd on other grounds." The Supreme Court ruled that the substantive count convictions could not be sustained on a Pinkerton theory, but could be sustained on an aiding and abetting theory. See Nye & Nissen, 336 U.S. at 618-20. Thus, the Court had no occasion to consider the quality or persuasiveness of proof needed to prove beyond a reasonable doubt a defendant's participation in a conspiracy.

[6] Phelps used the "slight" formulation in a curious way: "It is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight." 160 F.2d at 867-68 (emphasis added).

-28-

defendant with a conspiracy may be substantial and, if it is, is sufficient." Meyers, 94 F.2d at 434.

Marx also cited Galatas, using the qualification carried forward by Meyers: "[W]here a conspiracy is established, but slight evidence connecting a defendant therewith may still be substantial and[,] if so[,] sufficient." Marx, 86 F.2d at 250. Indeed, Marx stated the question to be "whether there was substantial evidence connecting the defendant with this conspiracy." Id. Galatas, the other case cited by both Phelps and Meyers, used the language quoted in Marx, see Galatas, 80 F.2d at 24, for which it cited Tomplain v. United States, 42 F.2d 202 (5th Cir. 1930).

The villain that appears to have first used the phrase "slight evidence" in federal case law with reference to adequate proof of a defendant's link to a conspiracy thus turns out to be Tomplain, which proclaimed, without any citation: "The conspiracy was conclusively established, and but slight evidence connecting the defendants was necessary."[7] Id. at 203. Although Marx and

---

[7] The Eighth Circuit has also identified Tomplain as the source of the "slight evidence" phrase. See United States v. Lopez, 443 F.3d 1026, 1029 (8th Cir. 2006) (in banc). Judge Wood's thorough opinion in United States v. Durrive, 902 F.2d 1221 (7th Cir. 1990), also traces the genealogy of the "slight evidence" phrase back to Tomplain. See Durrive, 902 F.2d at 1226 n.3.

Galatas had made clear that even though the quantity of evidence connecting the defendant to the conspiracy might be slight, the persuasive force of that evidence must nonetheless be substantial, i.e., sufficient to establish the element beyond a reasonable doubt, it is the "slight evidence" phrase from Tomplain, without qualification, that has too frequently been repeated in subsequent opinions.

Several circuits have rejected use of the "slight evidence" formulation. See United States v. Marsh, 747 F.2d 7, 13 & n.3 (1st Cir. 1984); United States v. Cooper, 567 F.2d 252, 253 (3d Cir. 1977); United States v. Burgos, 94 F.3d 849, 861-63 (4th Cir. 1996) (in banc); United States v. Partin, 552 F.2d 621, 628-29 (5th Cir. 1977); United States v. Durrive, 902 F.2d 1221, 1225-29 (7th Cir. 1990); United States v. Lopez, 443 F.3d 1026, 1029-30 (8th Cir. 2006) (in banc); United States v. Esparza, 876 F.2d 1390, 1391-92 (9th Cir. 1989); United States v. Clavis, 977 F.2d 538, 539 (11th Cir. 1992) (denying rehearing).[8]  Only the

<hr/>

Just six days before Tomplain, a district court had used the "slight evidence" phrase to describe what was "probably" needed to permit a jury to find a conspiracy, see United States v. Russell, 41 F.2d 852, 853 (S.D. Ala. 1930, an observation happily not since repeated.

[8]   Despite the rejection of the "slight evidence" formulation by the Fifth, Ninth, and Eleventh Circuits, the phrase still appears in decisions of those circuits:

Second, Sixth, and Tenth Circuits continue to invoke the "slight evidence" formulation. See United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); United States v. Kelley, 461 F.3d 817, 825 (6th Cir. 2006); United States v. Troutman, 814 F.2d 1428, 1446 (10th Cir. 1987).[9]

The first rejection was made by the Fifth Circuit, which ruled that a jury charge using the "slight evidence" formulation is reversible error, and error not even subject to harmless error analysis. See United States v. Partin, 552 F.2d 621, 628-29 (5th Cir. 1977). The Fifth Circuit, sitting in banc, then "banished" the "slight evidence" formulation, see United States v. Malatesta, 590 F.2d 1379, 1382 (5th Cir. 1979) (emphasis in

---

Fifth Circuit: United States v. Virgen-Moreno, 265 F.3d 276, 285 (5th Cir. 2001). See also United States v. Turner, 319 F.3d 716, 723 n.8 (5th Cir. 2003) (noting that although the Fifth Circuit "overruled the 'slight evidence' rule in United States v. Malatesta, [590 F.2d 1379, 1382 (5th Cir. 1979 (in banc),] nevertheless, this test persistently reappears").
Ninth Circuit: United States v. Cassidy, 2007 WL 1578293, *3 (9th Cir. 2007); United States v. Garcia, 173 Fed. Appx. 560, 561 (9th Cir. 2006).
Eleventh Circuit: United States v. Garcia, 405 F.3d 1260, 1270 (11th Cir. 2005); United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997).
See also United States v. Cassiere, 4 F.3d 1006, 1016 (1st Cir. 1993) ("Moreover, once the evidence establishes the existence of a conspiracy, lesser evidence may suffice to show a defendant's connection with the overall conspiracy.").

[9] The District of Columbia Circuit appears not to have spoken on the matter.

-31-

original), and later reversed a conspiracy conviction with the "slight evidence" phrase in the jury charge, despite the trial judge's effort to minimize the significance of the phrase. See United States v. Gray, 626 F.2d 494, 500-01 (5th Cir. 1980).

Although the Third Circuit has ruled that the phrase is an incorrect standard for the trier of fact, the Court stated that it is tolerable when used in appellate opinions reviewing sufficiency challenges because it is "no more than a shorthand expression of the rule that, after a guilty verdict by a jury or a finding of guilt by a trial court, an appellate tribunal may not substitute its inferences from the evidence for those drawn by the factfinder, if there was sufficient evidence to submit to the factfinder in the first place." Cooper, 567 F.2d at 253. The trouble with this distinction is that using the phrase in appellate opinions in the course of review of sufficiency challenges too easily permits appellate courts to fail to examine the evidence rigorously to assure that it sufficed to permit a jury to find guilt beyond a reasonable doubt. See Newman, supra, at 988-90. Cooper itself illustrates the risk. Although insisting that the evidence must be strong enough to permit a jury to "find the defendant guilty beyond a reasonable doubt," Cooper, 567 F.2d at 254 (internal quotation marks omitted), the

-32-

Third Circuit stated, "[T]here must be some evidence tending to prove that [the defendant] entered into an agreement and that he knew the agreement had the specific unlawful purpose charged in the indictment, id. at 253 (emphasis in original).

The First, Fourth, and Ninth Circuits, in rejecting use of the phrase "slight evidence" to describe what is required to prove the defendant's connection to a conspiracy, have stated that the evidence need show only a "slight connection" between the defendant and the conspiracy, even though that slight connection must be proven beyond a reasonable doubt. See Marsh, 747 F.2d at 13 & n.3; Burgos, 94 F.3d at 861-63; Esparza, 876 F.2d at 1391-92. The Fourth Circuit endeavored to explain the distinction in these words:

> Requiring [sic] that the defendant's connection to the conspiracy be "slight" in no way alleviates the Government's burden of proving the existence of the conspiracy and the defendant's connection to it beyond a reasonable doubt. The term "slight" does not describe the quantum of evidence that the Government must elicit in order to establish the conspiracy, but rather the connection that the defendant maintains with the conspiracy.

Burgos, 94 F.3d at 861 (emphases in original). The Ninth Circuit's explanation is similar:

> Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even

-33-

> though the <u>connection is slight</u>, is sufficient to
> convict him with knowing participation in the
> conspiracy.  Thus, the word "slight" properly modifies
> "connection" and not "evidence."  It is tied to that
> which is proved, not to the type of evidence or burden
> of proof.

<u>United States v. Dunn</u>, 564 F.2d 348, 357 (9th Cir. 1977)

(emphasis in original).

I doubt that the typical jury can appreciate the distinction.  Far better, as Judge Easterbrook has urged, to discard all references to "slight" and "not overwhelming" because these words inevitably create the risk of lowering the standard of proof significantly below "beyond a reasonable doubt." Moreover, there are several ways to explain to juries what the prosecution is not required to prove to establish the defendant's connection to the conspiracy, without using words connoting a reduced quantity of evidence.  A widely used model instruction states:

> I instruct you that to become a member of the
> conspiracy, the defendant need not have known the
> identities of each and every other member, nor need he
> have been apprised of all their activities.  Moreover,
> the defendant need not have been fully informed as to
> all of the details, or the scope, of the conspiracy in
> order to justify an inference of knowledge on his part.
> Moreover, the defendant need not have joined in all of
> the conspiracy's unlawful objectives.

1 L. Sand, <u>supra</u>, at ¶ 19.01, Instruction 19-6.

The Seventh Circuit has discarded even the "slight connection" phrase for use on appellate review of whether a defendant's participation with a conspiracy has been established, preferring an inquiry as to whether there was "substantial evidence" of such participation. See Durrive, 902 F.2d at 1228-29.

In the pending case, as Judge Walker has carefully demonstrated, the evidence sufficed to permit the jury to find beyond a reasonable doubt that Huezo was a participant in the charged conspiracy and that the other elements of the offense were also established beyond a reasonable doubt. Fortunately, we have not enlisted the Government's quite understandable invocation of the "not overwhelming" formulation to diminish in any way the standard of proof beyond a reasonable doubt that the jury was obliged to apply to every element, see Winship, 397 U.S. at 363, nor to lessen our obligation to assure that the evidence, assessed under the appropriate standards of appellate review after a finding of guilt, see Jackson v. Virginia, 443 U.S. 307, 318 (1979), permitted a reasonable jury to find the elements properly established. I have written at some length in the hope that henceforth the quantitative adjectives "slight" or "not overwhelming" or other variations will not be repeated either in

-35-

appellate opinions or in jury instructions with reference to the evidence sufficient to prove beyond a reasonable doubt a defendant's participation in a conspiracy.  The agreement of Judges Walker and Sotomayor with this opinion (despite the latter's dissent on the merits) gives me cause for considerable optimism.[10]

---

[10]    This opinion has been circulated to all of the judges of this Court prior to filing.

-36-

SOTOMAYOR, *Circuit Judge*, dissenting:

I agree fully with the majority that there was ample evidence establishing the existence of a large-scale, international money laundering conspiracy. I disagree, however, with the majority's conclusion that there was sufficient evidence for a rational juror to conclude, beyond a reasonable doubt, that Huezo had the requisite knowledge and specific intent to *launder* the proceeds of specified unlawful activity so as to support his conviction for money laundering or conspiracy. I concur fully with the district court's assessment of the evidence. I therefore would affirm Huezo's judgment of acquittal, and I respectfully dissent from the majority's opinion reversing the judgment.

As an initial matter, I agree with the majority that the recent Supreme Court decision in *Regalado Cuellar v. United States*, 128 S. Ct. 1994 (2008), provides meaningful guidance in interpreting the concealment element of the "transaction money laundering" statute, 18 U.S.C. § 1956(a)(1)(B)(i). Maj. Op. at 8–10. The transaction money laundering statute requires that a defendant have knowledge that a transaction is "designed in whole or in part" to "conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In *Regalado Cuellar*, the Supreme Court interpreted nearly identical language in the "transportation money laundering statute," 18 U.S.C. § 1956(a)(2)(B)(i), holding that "merely hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money." 128 S. Ct. at 2003. Rather, "a conviction under this provision requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute" of

–37–

the proceeds of unlawful activity. *Id.* at 2005. In short, the government must prove not merely that a defendant concealed funds, but also that a defendant had the intent to *launder* such funds by concealing or disguising their nature, location, source, ownership, or control.[1]

Under the transaction money laundering statute, the government must prove not only that the transactions in which Huezo participated were designed to launder money, but also that Huezo *knew* that a purpose of the transactions was to launder money. 18 U.S.C. § 1956(a)(1)(B) (requiring "know[ledge] that the transaction is designed in whole or in part" to conceal the nature, location, source, ownership, or control of proceeds of specified illegal activity). This knowledge requirement also applies to Huezo's conspiracy and aiding and abetting charges. *See United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996) ("To show specific intent [to aid and abet,] the prosecution must prove the defendant knew of the proposed crime . . . and had an interest in furthering it."); *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) ("To prove conspiracy, the government must show that the defendant . . . knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy . . . ." (internal quotation marks omitted)).[2] Thus, to support the conviction the government had to prove, *inter alia*, that Huezo (1) knew that the suitcases contained money; (2) knew that this money was the proceeds of illegal activity; and (3) knew that the transactions in which he

---

[1] Indeed, the legislative history of 18 U.S.C. § 1956 suggests that the scienter standard was deliberately heightened to "knowing" because lower standards, such as "reckless disregard" or "reason to know," "could lead to prosecution of people who were not in any way involved in money laundering." S. Rep. No. 99-433, at 6 (1986).

[2] I note that as Judge Newman stated in his concurrence, which I join, a defendant's participation in a conspiracy is an element of the conspiracy offense, and must itself be proven beyond a reasonable doubt.

participated were *designed* to conceal or disguise the nature, location, source, ownership, or control of such proceeds.

At the very best, the evidence cited by the majority might weakly support an inference that Huezo may have known that the suitcases contained money and that this money constituted proceeds of illegal activity—but the evidence supporting this inference certainly does not establish Huezo's knowledge of money laundering beyond a reasonable doubt. In finding differently, the majority ignores the clear lesson of *Regalado Cuellar*. Although there is evidence of a money laundering scheme in the case before us, the proof of Huezo's *knowledge* of a money laundering scheme is not qualitatively or quantitatively greater than the proof at issue in *Regalado Cuellar*. In *Regalado Cuellar*, the defendant was caught hiding a large sum of money in his car. Here, Huezo was seen delivering two suitcases filled with money. Indeed, the evidence of knowledge in *Regalado Cuellar* was arguably stronger, because "substantial efforts" were "expended to conceal the money" by placing it in a hidden compartment and covering it with animal hair, *id.* at 2003, whereas the money Huezo transported was merely placed in a suitcase. Regardless, *Regalado Cuellar* is clear that "merely hiding funds . . . is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money." *Regalado Cuellar*, 128 S. Ct. at 2003. Accordingly, Huezo's judgment of acquittal should stand.

Considering first Huezo's knowledge regarding the contents of the suitcases, notably, there is no evidence that Huezo ever saw the suitcases' contents or that he could have inferred their contents through conversations or activities in which he participated. For example, Huezo was not present at the November 5 meeting among Linares, Echevarria, and undercover officer Del Rio, where the three openly discussed their plans for the exchange of money, including the

time, vicinity, quantity, and manner in which the money was to be delivered. When Huezo *was* present—for example, during the November 8 drop-off with Del Rio—there is no evidence that the conspirators packaged the money in front of Huezo, that the money was exchanged openly, or that the meeting took place outside a bank or similar financial repository such that Huezo could infer that the suitcase contained money. Nor is there any evidence in the record suggesting that either Del Rio or Linares ever mentioned the contents of the suitcase or the purpose of the exchange during the drop-off. The absence of such evidence is fatal to the government's case, because "the exterior appearance of the [suitcases] was equally consistent with any number of different criminal offenses." *United States v. Samaria*, 239 F.3d 228, 237 (2d. Cir. 2001) (finding insufficient evidence that a defendant charged with conspiracy to receive or possess stolen goods and to commit credit card fraud, who helped collect boxes under circumstances suggesting criminal activity, knew that the boxes contained stolen goods).

The facts at issue in Huezo's case are similar to those in *United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004), where we found the evidence insufficient to support the defendant's conviction for possession of heroin with the intent to distribute and conspiracy to distribute heroin, despite the fact that "the government presented sufficient evidence from which the jury could have found that [the defendant] served as a lookout" in a drug transaction. *Id.* at 545. Critically, although the defendant in *Rodriguez* was in close proximity to boxes containing heroin, "the heroin was hidden inside a telephone box and also wrapped in two bags." *Id.* at 547. Because the appearance of the boxes did not establish their content, we concluded that the defendant's proximity to the hidden contraband did not amount to "circumstantial evidence adequate to prove" the defendant's "knowledge and specific intent to aid and abet a *drug*

-40-

transaction." *Id.* at 546–47. We similarly found that the fact that Rodriguez owned the car used in the drug transaction—just as Huezo owned the Jeep used in the money laundering transactions at issue in this case—did not establish his knowledge of the transaction's purpose. *Id.* at 546. Furthermore, although there was evidence that the defendant in *Rodriguez* participated in planning conversations, we found that this participation was insufficient to support a conviction because there was no evidence "of the precise contents of the conversations," and particularly whether these conversations mentioned drugs. *Id.* at 547–48; *cf. United States v. Labat*, 905 F.2d 18, 22 (2d Cir. 1990) (affirming a conviction for conspiracy to distribute narcotics when a defendant was heard using coded drug language during telephone conversations). Thus, even if we infer from Huezo's presence in the house and his relationship with Linares and Echevarria that he was present during discussions about the November 8 and November 10 delivery transactions, such conversations would be insufficient, absent details regarding the content of those conversations, to establish that Huezo knew that the suitcases contained money and that this money constituted the proceeds of illegal activity.

More importantly, however, no evidence exists with respect to Huezo's knowledge that the *purpose* of the November 8 and November 10 delivery transactions was to launder the proceeds of illegal activity. There is no evidence that Huezo was privy to or participated in any conversations that referenced money laundering. *Cf. United States v. Padilla*, 961 F.2d 322, 324–25 (2d Cir. 1992) (holding that there was sufficient evidence that a defendant who served as a lookout knew that the purpose of his trip to the airport was to pick up a drug courier because he was present for a planning conversation that referenced the "DEA" and the presence of dogs at the airport). Furthermore, the evidence supports an inference that Huezo was only a minor actor

who would not necessarily have participated in such conversations: Huezo's name was never mentioned during the November 5 planning meeting, and Officer Del Rio testified that he had never seen nor heard Huezo's name prior to the November 8 drop-off.

Even more critically, Huezo's behavior during the November 8 and November 10 deliveries was equally consistent with a belief by Huezo that he was simply transporting the proceeds of a drug transaction—or engaged in some other criminal activity—leaving him without the requisite knowledge that the purpose of the transactions was to launder money. For example, although Agent Adamo testified that Huezo "was providing an extra layer of security" when Echevarria moved the suitcase from the house on November 10, such behavior was consistent with a belief by Huezo that he was transporting money for a drug transaction, or transporting other valuable merchandise such as drugs. Viewing the evidence in its totality, there is simply no greater evidentiary basis for the inference that Huezo thought he was engaged in money laundering than there is for the inference that he thought he was involved in some other illegal activity, such as transporting drug payments. "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted). Accordingly, as in *Samaria*, where we rejected the government's argument that because a defendant aided in the pick-up of stolen goods he intended to participate in the specific crime charged, the majority's argument "rests upon the unproven assumption that [Huezo] knew" that the November 8 and November 10 transactions were "designed" to launder money. 239 F.3d at 236; Maj. Op. at 14–16. Such unproven assumptions are insufficient to support a conviction.

-42-

The majority attempts to distinguish our precedents by arguing that in *Samaria* the defendant was a "gypsy cab driver" with no other connection to the conspirators, while Huezo had a sustained relationship with Linares and Echevarria and had traveled from California soon before the transactions, which suggests that he would not have been involved in the transactions by mere happenstance. *See* Maj. Op. 19–20; *Samaria*, 239 F.3d at 232–33. This argument is unconvincing. With respect to Huezo's relationship with Linares and Echevarria, the majority overlooks that the defendant in *Samaria* participated in two separate pickups of stolen goods with his alleged conspirators, including one in which he rode as a passenger, which we concluded "may help establish that [the defendant] had a closer association with [the conspirators] than that of a taxi driver."[3] *Id.* at 238. But despite evidence of this closer association, we nonetheless concluded that the defendant's work as a driver and a lookout did not indicate that he "was aware of the specific crimes charged and . . . had the specific intent to participate in those crimes." *Id; see also United States v. Gaviria*, 740 F.2d 174 (2d Cir. 1984) (cited by *Samaria*, 239 F.3d at 241-42) (finding insufficient evidence of a defendant's specific intent to participate in a conspiracy to possess with intent to distribute cocaine, despite the defendant's long association with a known drug trafficker and her pattern of suspicious behavior, including counter-surveillance). Under these precedents, Huezo's relationship with Linares and Echevarria is not sufficient to establish that he knew the specific nature of the transactions in which he participated or assisted.

---

[3] Furthermore, although the majority suggests that the defendant in *Samaria* was "simply performing his regular job," Maj. Op. at 20, the government presented evidence that he served as a lookout as well as a driver, *Samaria*, 239 F.3d at 237–38. This evidence undermines the majority's characterization of the defendant in *Samaria* as an "unwitting outsider." Maj. Op. at 20.

-43-

Likewise, in cases where we found travel indicative of a defendant's knowledge and intent to participate in a conspiracy, the defendant's travel patterns were more suspicious than Huezo's, and the government presented additional strong evidence of the defendant's knowledge of the underlying crimes. For example, in *United States v. Aleskerova*, 300 F.3d 286 (2d Cir. 2002), a defendant charged with conspiracy to possess, conceal, and sell stolen artwork booked a last-minute trip from Azerbaijan to New York on the same day the conspirators scheduled a critical meeting in New York, arriving in New York fifty minutes before that meeting. *Id.* at 293. The government also presented evidence that the defendant "was sent to view the [stolen] art, was trusted to know its location, and was told the combination to the suitcase [holding the art]," which we found "strongly suggest[ed] her full, knowing participation in the conspiracy." *Id.* at 294. The defendant also discussed delivery of the artwork with another conspirator, *id.* at 291, further supporting the inference that she knew the purpose of the conspiracy. Likewise, in *United States v. Pedroza*, 750 F.2d 187 (2d Cir. 1984), we inferred a defendant's membership in a kidnaping conspiracy based on evidence that he "had to criss-cross the country [from Miami to Los Angeles and from Los Angeles to New York] to be present at the critical times" for the kidnaping, "*together with*" evidence that the defendant was present in a house for two weeks with the kidnaped child, was present with the conspirators and the kidnaped child on the night the conspirators made final ransom arrangements, and was present when the conspirators permitted the kidnaped child to talk to his father on the telephone. *Id.* at 193, 198-99 (emphasis added). In contrast, the evidence in Huezo's case at most suggests that Huezo arrived in

Connecticut several days before the November 8 and November 10 deliveries,[4] and there is no evidence that he made multiple long-distance trips that happened to correspond to critical events in the conspiracy. There is also no evidence that Huezo participated in planning sessions about the laundering of money, or even saw the content of the suitcases. Absent such evidence, the inferential leaps required to tie Huezo's travel from California to a specific intent to join a money laundering operation—including that his travel to Connecticut was connected to the presence of Linares and Echevarria, that any such travel was not merely social, and that any business reasons for his travel were more consistent with money laundering than with another crime—are simply too great to give his travel the probative value the majority ascribes to it.[5] *See Glenn*, 312 F.3d at 70 ("[A]s the inferential leap between the fact and the proposition to be derived grows, the probative value of the evidence diminishes.").

The other circumstantial evidence cited by the majority is also inadequate to establish Huezo's knowledge regarding the purpose of the transactions, even when considered in its totality. For example, although the majority suggests that common sense supports the inference that the principals of the conspiracy would not have trusted an outsider to participate in the

_____

[4] The evidence that Huezo *recently* traveled to Connecticut from California is itself weak. The government relies completely on the fact that Huezo provided a California address to a hotel shortly before the November transactions. The government presented no evidence of Huezo's travel itinerary, and officer Fernandez testified that Huezo had a Connecticut driver's license.

[5] The majority suggests that because Linares and Echevarria had California driver's licenses and Huezo gave a California address to a hotel shortly before the November transactions, a rational juror could conclude that "the three men traveled from California to Connecticut and met for the express purpose of facilitating the money laundering conspiracy." Maj. Op. at 17. This conclusion rests on several unproven assumptions. For example, Linares' and Echevarria's California licenses do not establish when they last visited California, and the government presented no evidence that Linares, Echevarria, and Huezo traveled *together* from California to New York.

-45-

money laundering transactions or share a house with conspirators, Maj. Op. at 16-17, common sense could also support the opposite conclusion—that the leaders of the conspiracy might want to keep Huezo uninformed about the intended goal of the conspiracy for plausible deniability reasons in case he was ever questioned, or to avoid having to pay him more for his services. Such an inference is buttressed by the absence of any evidence that money was packaged or left visible in the house. *Cf. United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir. 1992) (holding that because the defendant was present in an apartment where large-scale narcotics operations were *conspicuous*, "[t]he jury could . . . have reasonably determined that only trusted members of the operation would be permitted entry into the apartment, because allowing outsiders to have access to an apartment with large quantities of narcotics in *plain view* could compromise the security of the operation." (emphasis added)).

The majority also emphasizes that, on November 10, Huezo personally carried a small bag containing $6,000, packaged similarly to the bundled cash in the larger suitcases, from the house to behind the driver's seat of his Jeep. Maj. Op. at 15–16. According to the majority, a rational juror could conclude that Huezo's "special treatment" of the bag indicates that the bag belonged to him and that it contained profits from the money laundering conspiracy that were paid to him for his assistance. *Id.* This evidence simply does not support the conclusion the majority draws. Agent Adamo, who described Huezo's movements, conceded that he knew nothing about the circumstances surrounding Huezo's carrying of the bag, including whether Linares had asked Huezo to carry it for him. Furthermore, the record indicates that Linares and Echevarria were both passengers in the Jeep, such that one of them would have had to have been in the back seat next to the bag. Accordingly, Huezo's placement of the bag behind the driver's

seat is consistent with the inference that it was the back seat passenger who owned the bag, and not Huezo. To the extent that Huezo's treatment of the bag might suggest that it belonged to him and that it constituted payment for his activities, this evidence still fails to establish that Huezo knew that he was being paid for participation in, and with proceeds from, a *money laundering* conspiracy, rather than some other illegal activity.[6]

In sum, I disagree with the majority that, when viewing the evidence in its totality, a rational juror could conclude *beyond a reasonable doubt* that Huezo knew that the purpose, rather than merely the effect, of the November 8 and November 10 transactions was to conceal or disguise proceeds from illegal activities. While each piece of circumstantial evidence discussed by the majority may be probative to some degree of Huezo's guilty knowledge that he was involved in something illegal, the evidence in its totality is insufficient to demonstrate beyond a reasonable doubt that Huezo knew that the transactions in which he participated were *designed* to launder the proceeds of illegal activity. *See Regalado Cuellar*, 128 S. Ct. at 2003–05. As the Supreme Court observed in *Regalado Cuellar*, in cases "where the consequences of an action are commonly known," a criminal defendant's knowledge or purpose can be "shown circumstantially based on inferences drawn from evidence of effect." 128 S. Ct. at 2005 n.8. Delivering suitcases

---

[6] In reaching the opposite conclusion, the majority relies heavily on a statement in *Samaria*, in which we indicated that one possible circumstantial indicia of knowledge and specific intent would be that the defendant "received a share of the profits from the conspiracy." *Samaria*, 239 F.3d at 235. In support of this proposition, *Samaria* cited *United States v. Markiewicz*, 978 F.2d 786 (2d Cir. 1992). *Samaria*, 239 F.3d at 235. In *Markiewicz*, however, the defendants, unlike Huezo, "essentially concede[d]" that they knew the source of the funds they had received. *Markiewicz*, 978 F.2d at 806. In light of this different fact pattern, the majority reads too much into *Samaria* in suggesting that Huezo's carrying of a camera-sized bag containing some money is sufficient to prove his knowledge that the purpose of his delivery of a suitcase containing money was money laundering, even though he would have been paid for activities that were equally consistent with other crimes.

containing money, however, is common not only to money laundering. Although *Regalado Cuellar* gives us clear guidance that a participant in a money laundering transaction must know that the purpose of the transaction is to launder money, it is apparent from the majority's opinion that it fails to follow the Supreme Court's directive. The majority fails to recognize that evidence of such knowledge must be something more than mere presence at the exchange or delivery of concealed money. Because I do not believe that the evidence presented at trial demonstrates that Huezo knew the specific purpose of the transactions in which he participated, I respectfully dissent.